### In re PROGRESSIVE WALL PAPER CORPORATION.

### In re FIRST NAT. BANK OF BALLSTON SPA, N. Y.

#### (District Court, N. D. New York. June 4, 1915.)

1. PLEDGES ⨺9—DEBTS WHICH MAY BE SECURED—PRE-EXISTING LIABILITY.

   The existence of a valid indebtedness is a sufficient consideration for a new promise or a pledge of property as security for the payment of such indebtedness.

   [Ed. Note.—For other cases, see Pledges, Cent. Dig. § 20; Dec. Dig. ⨺9.]

2. CORPORATIONS ⨺471—VALIDITY OF BONDS—BONDS ISSUED FOR "PROPERTY" —PLEDGE.

   Mortgage bonds, issued by a corporation and pledged to a bank as collateral security to a note of the corporation for an amount equal to their par value, given in renewal of a prior valid note, in consideration of such renewal, without the indorsement of one who was bound by the prior note, and under an agreement with the pledgee that it would not sell the bonds for less than their par value, were issued for "property," within the meaning of Stock Corporation Law N. Y. (Consol. Laws, c. 59) § 55, which provides that "no corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of the corporation," and are valid in the hands of the pledgee.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1833–1836, 1838, 1840; Dec. Dig. ⨺471.

   For other definitions, see Words and Phrases, First and Second Series, Property.]

3. BANKRUPTCY ⨺323—SECURED CREDITOR—RIGHT TO PROVE FOR BALANCE DUE.

   In such case, where the corporation became a bankrupt, the bonds not having been sold, if the pledgee realizes from the sale of the mortgaged

property, sold in foreclosure or by the trustee, less than the amount of the note, it may prove the balance against the estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 503, 505, 513; Dec. Dig. ⊜⟩323.]

In Bankruptcy. In the matter of Progressive Wall Paper Corporation, bankrupt. On review of order of referee declaring invalid bonds of bankrupt held by First National Bank of Ballston Spa, N. Y., as pledgee. Reversed.

This is a review of an order made by William P. Badger, referee in bankruptcy, adjudging that seven mortgage bonds made by the above-named bankrupt, or its predecessor in name, the Progressive Wall Paper Corporation, for $1,000 each, and now in the possession of the First National Bank of Ballston Spa, N. Y., as collateral security for a note of the said corporation given to and now held by said bank, have never been lawfully issued, and that same are null and void; also that the claim of the said bank to hold said bonds as collateral security for the said note of the bankrupt or otherwise is illegal, and that the said bank is not a lawful owner and holder of the bonds or any of them. The order of the referee also forever enjoins and restrains the said First National Bank of Ballston Spa from selling, negotiating, or in any way disposing of the said bonds, or any of them, and directs that the said bank deliver such bonds to Fred H. Justin, as trustee in bankruptcy of the said bankrupt corporation, the Progressive Wall Paper Corporation.

Weeds, Conway & Cotter, of Plattsburg, N. Y. (Frank E. Smith, of New York City, of counsel), for trustee in bankruptcy.

Luther A. Wait, of Saratoga Springs, N. Y. (Edgar T. Brackett, of Saratoga Springs, N. Y., of counsel), for claimant.

RAY, District Judge. The above-named bankrupt, the Progressive Wall Paper Corporation, a corporation of the state of New York and doing business at Plattsburg, in said state of New York, on the 23d day of November, 1914, was duly adjudged a bankrupt, and December 10, 1914, Fred H. Justin was duly appointed trustee of the bankrupt estate and property and duly qualified as such. In or about July, 1905, the now bankrupt corporation borrowed the sum of $10,000 from the First National Bank of Ballston Spa, and gave to it its promissory note therefor, and which note bore certain indorsements. Partial payments were made on said note from time to time, and renewals for the unpaid parts were made, until January 22, 1912, when the said bank held the note of the bankrupt due on that day for the sum of $7,000, that being the unpaid balance of the loan of July, 1905. On that day, January 22, 1912, the said note of $7,000 was unsecured, except by the indorsements of John J. Cunningham, Grenville M. Ingalsbee, John H. Derby, and Asahel R. Wing, who were officers of the said now bankrupt corporation.

On said last-mentioned day a renewal note for $7,000, made by the bankrupt and indorsed by said Cunningham, Ingalsbee, and Derby, was made and delivered to the said bank in payment or renewal of the prior note for the same amount. Asahel R. Wing, one of the prior indorsers as stated, declined to indorse further, and in place of his indorsement and as further security the said now bankrupt corporation delivered to

the said bank as collateral security for the payment of the said note and debt the said seven second mortgage bonds made by the bankrupt. These bonds were secured by a mortgage on the real property and plant of the said now bankrupt corporation, and which mortgage had been given to the Adirondack Trust Company as trustee named therein. This mortgage was dated November 1, 1911. Up to the time these bonds were delivered to the said bank as aforesaid they had not been issued or used in any way by the now bankrupt corporation, but had remained in the possession of the officers of said corporation. The mortgage was recorded and the formalities of the execution of said bonds had been complied with. The mortgage had been made, delivered, and recorded pursuant to a resolution of the authorities of said corporation and is in due form. On the 2d day of November, 1911, the directors of the now bankrupt corporation had adopted the following resolution:

"Resolved, that the treasurer of this corporation be authorized to issue the bonds of the corporation which are secured by the mortgage upon its property and franchises, dated November 1, 1911, to pay, or to secure, as collateral, the payment of the notes of the corporation, now outstanding, indorsed by John J. Cunningham, John H. Derby, Asahel R. Wing, and Grenville M. Ingalsbee, and to secure as collateral the payment of other notes of the corporation, which may be given hereafter in the transaction of its business, and to pay or secure as collateral renewals of any of said notes, without reference to degree of removal of the said renewal or renewals, from the note or notes now outstanding, and that said treasurer be authorized to receive said bonds from the trustee."

Prior to January 22, 1912, the indorser Wing had sold his interest in the now bankrupt corporation, and on that day, when said note for $7,000 became due, it was arranged by the corporation and the First National Bank of Ballston Spa and the indorsers Cunningham, Derby, and Ingalsbee that thereafter the note given for the debt and in renewal should be indorsed by Cunningham, Derby, and Ingalsbee, and not by Wing, and that there should be deposited seven of the said second mortgage bonds issued under said mortgage as collateral security for the payment of said note. The renewal note of January 22, 1912, indorsed by Cunningham, Derby, and Ingalsbee, and accompanied by the said bonds in question, were delivered to the said bank on said 22d day of January, 1912, pursuant to the said arrangement and agreement. That note has been renewed from time to time at the same sum, with the same indorsers, and the said bonds have remained in the possession of the bank ever since as collateral for the note and debt.

The note now held by the bank, representing said debt and for which the said bonds are held as collateral, reads as follows:

"$7000.00. Plattsburgh, N. Y., October 17, 1914.

"Three months after date we promise to pay to the order of John J. Cunningham, Grenville M. Ingalsbee, and John H. Derby the sum of seven thousand 00/100 dollars, at the First National Bank of Ballston Spa, N. Y., for value received, having deposited with said bank, as collateral security, seven bonds of the Progressive Pulp & Paper Company, for $1,000.00 each, being numbered 31, 32, 33, 34, 35, 36, and 37, with full power to sell same at public or private sale at the option of said bank, after ten days notice in writing, by mail, directed to us at Plattsburgh, N. Y., and to apply the proceeds thereof towards the payment of this note, and of any other note or

notes held by the said bank, of which we are either the maker or indorser, accounting to us for the surplus of said sale, if any, with interest.

"Progressive Wall Paper Corporation,
"by A. S. Derby, Treas.

"Countersigned: John J. Cunningham, Prest.
"Due Jan'y 17, 1915."

This note was indorsed as follows:

"Indorsed:
"John J. Cunningham.
"Grenville M. Ingalsbee.
"John H. Derby,
"By Archibald S. Derby, Atty."

The note of January 22, 1912, read the same, except as to date.

January 15, 1915, said Ingalsbee, an indorser on said note, filed with the referee the claim on said note held by the bank against the said Progressive Wall Paper Corporation, and such claim was filed as a secured claim, stating that the security held by the said First National Bank of Ballston Spa for the said debt was the said seven second mortgage bonds of said corporation of the face value of $1,000 each. To this claim was attached a copy of the last renewal note, which bore date October 17, 1914, and which was indorsed as above stated. On or about January 20, 1915, the said bank gave notice to said trustee in bankruptcy and to the said indorsers that said bonds would be sold at public auction to the highest bidder at its banking house on the 30th day of January, 1915, pursuant to the contract and agreement by which same were pledged.

Thereupon the trustee in bankruptcy, Fred H. Justin, filed his petition, setting forth the facts and alleging that said bonds were illegally and improperly issued, and not valid or legal, and not the property of the bank, and that the bank was not entitled to hold same, and pursuant to the prayer of the petition the bank was enjoined and restrained from selling or disposing of the bonds until the further order of the court, and the said bank was required to show cause why it should not be adjudged and determined that the pledge and lien claimed by the bank on said bonds was and is illegal and invalid, and why the said bonds should not be declared void, and an order made directing the bank to return same to the trustee, or why the said bank should not be restrained from enforcing the pledge or lien, if the same should be found valid, through a sale thereof. Other relief, such as the petitioner might be entitled to, was also prayed for.

The bank appeared, and evidence was taken, and the referee made an order now under review adjudging:

That the said mortgage bonds, seven in number, "have never been lawfully issued, and that the same are null and void. (2) That the claim of the said bank to hold said bonds as collateral security for the note of the bankrupt or otherwise is illegal, and the said bank is not a lawful owner and holder of said bonds. (3) That the said First National Bank of Ballston Spa, N. Y., be and it hereby is forever enjoined and restrained from selling, negotiating, or in any way disposing of said bonds or any of them. (4) That said bank deliver up the said seven second mortgage bonds to Fred H. Justin as trustee herein."

This is the order under review.

The said Progressive Wall Paper Corporation, at the time the petition was filed against it, was insolvent, its debts amounting to about $345,000, including bonded debts, and the property, exclusive of real estate, was worth about $79,000, and it would also appear that the real estate is not of sufficient value, exclusive of the mortgage in question and the bonds issued under it, to pay the balance of the indebtedness of the corporation.

The referee was requested to find, but refused to find:

"That the First National Bank of Ballston Spa, N. Y., received said bonds in good faith and for value, before maturity, and without notice of any infirmity. That said bonds, when issued, were valid, and they have continued to be and still are valid, obligations of the bankrupt."

The First National Bank of Ballston Spa, N. Y., has agreed that it will not sell the said bonds, or any of them, for less than par. The indebtedness of the bankrupt corporation, the Progressive Wall Paper Corporation, to the claimant, First National Bank of Ballston, Spa, at the time of the bankruptcy, in the full sum of $7,000 on the note in question, a copy of which is set out above, is conceded. It is also conceded that the said note represents a part of the original debt of $10,000 incurred by the corporation in July, 1905. It is not denied or questioned that when Wing, one of the indorsers on the note originally given, and the renewals thereof given prior to and including the one existing January 22, 1912, sold out his interest in the now bankrupt corporation, he refused longer to be an indorser, and that it was then agreed between the First National Bank of Ballston Spa and the now existing corporation and the indorsers Cunningham, Ingalsbee, and Derby that the indebtedness should be allowed to run; that is, that the bank would continue to give credit to the corporation on its promissory note indorsed by Cunningham, Ingalsbee, and Derby, but that the corporation should put up with the bank as collateral security to the note and indebtedness represented thereby the said bonds or obligations of the corporation. It is conceded that these bonds or obligations had not been issued—that is sold or delivered to any one—before that. The mortgage given to secure this issue of bonds, which amounted to some $100,000, of which the $7,000 was a part, was duly authorized and recorded, and is in all respects regular. No defect is pointed out. The bonds themselves are properly made out, and are legal and valid on their face. There is no irregularity in the making and execution of the bonds. The resolution of November 2, 1911, adopted by the board of directors of the Progressive Wall Paper Corporation, or its predecessor in name, as the case may have been, is challenged. The referee was requested to find that the resolution of that date was duly passed. The referee did not so find, but found as follows:

"I find that such resolution was passed, but find that it was illegal, in so far as it authorized the issue of said bonds as collateral security for antecedent debts of said corporation."

It is noted that the resolution provides that the treasurer of the corporation is authorized to issue the bonds of the corporation secured by the mortgage referred to—

"to pay or to secure as collateral the payment of the notes of the corporation now outstanding, indorsed by John J. Cunningham, John H. Derby, Asahel R. Wing, and Grenville M. Ingalsbee, and to secure as collateral the payment of other notes of the corporation which may be given hereafter in the transaction of its business, and to pay or secure as collateral renewals of any of said notes, without reference to degree of removal of the said renewal or renewals from the note or notes now outstanding, and that said treasurer be authorized to receive said bonds from the trustee."

Under this resolution and by virtue thereof the treasurer did receive the bonds from the trustee, the Adirondack Trust Company, and under the agreement set forth did deliver same to the claimant here, the First National Bank of Ballston Spa. There is no question that the $10,000 borrowed of this bank in 1905 was borrowed for and used for the business of the corporation. At the time of the renewal of the note and the pledging of these bonds to the bank, the corporation was doing business, and it was necessary for it to have an extension of credit. The credit before had at the bank was secured by the indorsements of Cunningham, Ingalsbee, Derby, and Wing. The indorsement of Wing could no longer be obtained. The transaction and facts found and stated show that the pledging of the bonds as security for the indebtedness was to secure from the bank a surrender of the old note and an extension of credit, in effect a new loan of $7,000 secured by the note of the corporation indorsed by Cunningham, Derby, and Ingalsbee, and further secured by a pledge of the bonds or obligations of the corporation. These bonds were in turn secured by a mortgage upon the real estate of the principal debtor, the Progressive Wall Paper Corporation. In effect, the delivery of the bonds to the bank gave to it a lien upon the real estate of the corporation. The situation then was that the bank held the promissory note of the Progressive Wall Paper Corporation, now bankrupt; that is, it held the promise to pay of such corporation. It also held another promise to pay $7,000, made by the same corporation. There is abundant authority for the proposition that a mere promise of a debtor to pay the debt owing and evidenced by a prior written promise to pay such debt may not be regarded or treated as collateral security. But it is otherwise when the second promise is in the form of a pledge of property of the debtor, either personal property or real estate. A. may give his note to B. It is a mere written promise to pay. A. may also execute and deliver to B. at the same time, or at another time, a mortgage on personal property or a mortgage on real estate owned by him as collateral to his original promise, and this is in a sense collateral security for the payment of the debt. The one promise is collateral to the other; but it is of a different nature and quality, inasmuch as it pledges either personal property or real estate owned by the debtor to the payment of the debt. I know of no rule of law or statute which forbids a debtor to secure his obligations at a date subsequent to the original promise and the receipt of the original consideration by mortgage upon his property, unless it be in cases of insolvency, where preferences are for-

bidden or there be fraud in the transaction.    I am not now discussing the effect of section 55 of the Stock Corporation Law of the state of New York (Consol. Laws, c. 59), which provides:

"No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation."

[1] The Corporation Law of the state of New York and many recent court decisions of that state and federal decisions make it plain, I think, that the existence of a valid indebtedness is a sufficient consideration for a new promise or a pledge of property as security for the payment of such indebtedness.    The old debt and extension of time for the payment thereof is value within the meaning of the law.

[2] In this case the bank not only extended the time for the payment of the debt by accepting the new note payable at a future day, but lost the benefit of the name and obligation of one of the indorsers to pay the debt, and accepted in lieu thereof and in consideration of the extension of time of payment the bonds in question.    As stated, these bonds were a promise to pay executed by the debtor; but they were secured by mortgage upon the real estate of the debtor.    This was a new and an additional security.    Negotiable Instruments Law (Consol. Laws, c. 38) § 51, provides:

"Value is any consideration sufficient to support a simple contract.    An antecedent or pre-existing debt constitutes value, and is deemed such whether the instrument is payable on demand or at a future time."

See language of Justice Miller in King v. Bowling Green Trust Co., 145 App. Div. 398, 402, 129 N. Y. Supp. 977.

There was no fraud in this transaction.    The bonds were turned over to the bank as security for the payment of the note more than four months prior to the bankruptcy, and, as stated, there was a sufficient consideration, a valuable consideration.    The bank knew, of course, that these bonds were the obligations of the debtor, the Progressive Wall Paper Corporation.    The bank not only knew that they were obligations of the corporation, but also knew that they carried with them a lien upon the real estate of such corporation.    The bank knew that they had not been issued to other parties, and were not owned by other parties.    In short, the bank knew, when it took these bonds, that it was receiving the obligation of the debtor or its promise to pay at a future time, and that such promise was secured by mortgage on the real estate of the corporation.    The bank also knew of the existence on the statute books of section 55 of the Stock Corporation Law of the state of New York, which as already stated provides that no corporation shall issue bonds except for money, labor done, or property actually received for the use and lawful purposes of such corporation.    Assuming that the bank has made a binding agreement, and this is asserted by the attorney for the bank in his brief, that it will not sell these bonds for less than their par value, the proceeds of a sale will pay the note, as the proceeds will be applicable thereto and reduce the note for $7,000 by the amount of the par value of the bonds, which is also $7,000.    In other words, the note held by the bankrupt will be extinguished or paid by the application thereto of the proceeds of the bonds of the debtor

executed and delivered to the bank more than four months prior to the bankruptcy. This will not work a preference, provided the bonds are legal and were legally issued, and the bank had the right to receive them as security for the payment of the note.

These bonds must have been issued—that is, delivered—by the Progressive Wall Paper Corporation to the bank in exchange for either money, labor done, or for property actually received for the use and lawful purposes of such corporation within the meaning of the language of the statute. If the quotation means that the money must be paid over at the time that the bonds are issued, then these bonds were not issued for money. There is no pretense that they were issued for labor done. Were they issued for property actually received for the use and lawful purposes of such corporation? If this language means that some tangible, usable, or marketable property must be received for the bonds when issued, then these bonds were not issued for property actually received for the use and lawful purposes of such corporation. In connection with the new or renewal note, indorsed as stated, these bonds were issued in exchange for the old note of the corporation, which it actually owed, and to enable it to continue business. The old note was received for the purpose of being canceled and retired. The old note or obligation was received by the corporation, and was retired. The note surrendered, indorsed as it was by Wing with the others, was property in the hands of the bank, and was surrendered. If the provision quoted (section 55 of the Stock Corporation Law) is intended to forbid a solvent corporation, owing debts evidenced by its notes indorsed by its officers, to issue its bonds secured by a mortgage on its real property, and use such bonds in exchange for and for the purpose of retiring the old or pre-existing notes, then, of course, these bonds are void in the hands of the bank. It does not seem to me that this was the purpose of the provision quoted. The occurrences of January 22, 1912, constituted a new transaction between the corporation and the bank. A new note was given, but one of the old indorsers was absolutely released, and the old note surrendered. A new note was given, with three indorsers in place of four. The time of payment was extended, and there was a new contract between the corporation and the bank and these indorsers, by which the bonds of the corporation secured by mortgage were to be placed with the bank as security for the payment of the note, and this operated, not only for the benefit of the bank and the corporation, but for the benefit of the three indorsers. Can it be said that the bank did not surrender property to the corporation in exchange for the bonds and the new note indorsed by the three, within the meaning of section 55 quoted?

The Corporation Law of the state of New York authorizes corporations organized thereunder to borrow money necessary for the transaction of their business and to issue and dispose of their obligations. Laws of New York 1892, c. 688, § 2, contains such a provision, and section 42 provided:

"That no corporation shall issue bonds except for money, labor or property actually received for its use and lawful purposes, and that no bonds shall be issued for less than the fair market value thereof."

Under this statute it was held by the Circuit Court of Appeals in this (the Second) circuit that where a corporation, being in need of money, pledged certain of its bonds secured by mortgage to a bank as security for further credit, under an agreement that the corporation might sell any of the bonds at par and on delivery of the proceeds thereof to the bank it would release and redeliver such bonds to the corporation, and the bank immediately thereafter extended its line of credit to the corporation, such bonds were properly issued and constituted valid claims against the corporation's estate in bankruptcy. In re Waterloo Organ Co., 134 Fed. 345, 67 C. C. A. 327.

In that case, at the time of the transfer of the bonds to the bank, the company was directly indebted to the bank upon its own notes in the sum of upwards of $6,000 and contingently liable as indorser on the business paper of its customers, which had been discounted by the bank for the benefit of the company, in the further sum of $33,000. On the delivery of the bonds the bank increased its line of discount to the company, and the indebtedness of the company to the bank was largely increased, and so continued down to the time of the adjudication, when the amount of paper on which the company was directly liable had been increased to $11,000, which was a sum in excess of the par value of the bonds. The court, per Townsend, Circuit Judge, said:

"In view of the amount then due, and the immediate increase by the bank of the company's line of discount until the direct liability alone of the company exceeded the fair market value or par value of said bonds, we think it may fairly be inferred that the company was in need of further funds in order to carry on its corporate business, that the bank was unwilling to grant further credits, except upon receipt of further security, and that the agreement between the parties was that said bonds should be issued at their fair market value, which was their par value, and that they were actually issued for property in the nature of advances, loans, discounts, credits, etc., received for the use and lawful purposes of said corporation, and that said issue, therefore, was valid."

This case is not on all fours with the one now at bar. In that case there were further advances and loans made by the bank. Here there was no further advance or loan of money, only an extension of time of payment of the then existing debt, accompanied by the release of one of the indorsers and the substitution of these bonds secured by mortgage as security for the payment of such debt. But it seems to me that here was the obtaining of property from the bank in exchange for these bonds, to wit, the old note, which bore the indorsement of Wing, and which note in the hands of the bank was clearly property.

It is a fair inference from all the facts that the corporation would not have obtained the surrender of this old note but for the pledge of the bonds in question. The statutes of the state of Wisconsin (St. 1913, § 1753) provide that no corporation shall issue bonds, except for money, labor, or property estimated at its true value actually received equal to 75 per cent. of the par value thereof, and that all bonds issued contrary thereto shall be void. Certain creditors of a corporation accepted its bonds secured by a mortgage as collateral for their past-due claims at not less than 75 per cent. of their face value, and extended the time of payment of the claims. The creditors took them under an

agreement either to return them or to account therefor at 75 cents on the dollar. It was held by the Circuit Court of Appeals, Seventh Circuit, in First Savings Bank & Trust Co. et al. v. Waukesha Canning Co. et al., 211 Fed. 927, 128 C. C. A. 305, reversing Nichols v. Waukesha Canning Co. (D. C.) 195 Fed. 807, that such bonds were issued for property and were valid. In that case the corporation was being pressed by its creditors, and issued its bonds secured by mortgage, and delivered them as collateral security to its own debts existing prior to the making of the mortgage and bonds. The prevailing opinion, in which all concurred, says (211 Fed. 929):

"Concretely stated, did the issue and application of the bonds in suit as collateral security to existing indebtedness constitute the issue and application of bonds for money or labor or property?"

The court held, following Pfister v. Milwaukee Electric Ry. Co., 83 Wis. 86, 53 N. W. 27, and Memphis & Little Rock R. R. v. Dow, 120 U. S. 298, 7 Sup. Ct. 482, 30 L. Ed. 395, that when the bonds were put by the corporation issuing them beyond its control by hypothecating them as security for loans or for any other purpose or in any other manner, it issued them within the meaning of the statute. In Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 17 L. R. A. 375, the court, considering a similar statute, said:

"And we do not think that such pledge to secure debts already contracted, if made without fraud and solely for the bona fide purpose of satisfactorily securing the payment of corporate debts, can properly be regarded as effecting a fictitious increase of indebtedness, or as not issued for money, labor done, or money or property actually received."

The Constitution of the state of California provides that:

"No corporation shall issue stock or bonds, except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." Article 12, § 11.

In Atlantic Trust Co. v. Woodbridge Canal & Irrigation Co. (C. C.) 79 Fed. 842, it was held by Morrow, District Judge, that this constitutional provision did not prevent a corporation from pledging its bonds as collateral security for the payment of a debt incurred by it less in amount than the par value of the bonds. He also held that such a pledge is an issue of the bonds. It is true, as was stated by the judge writing the opinion in the case last cited, that the stipulated facts did not disclose whether or not the bonds in question were pledged as collateral security for the pre-existing indebtedness. The whole reasoning, however, of Judge Morrow, especially pages 846 and 847 of 79 Fed., would indicate that he regarded bonds issued and pledged as collateral to pre-existing indebtedness of the corporation valid. The Supreme Court of the United States, in Railway Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595, in considering section 8 of article 12 of the Constitution of the state of Arkansas, which is substantially the same as that of the Constitution of the state of California referred to, and substantially the same as the statute of the state of New York, declared the purpose and scope of such provisions and said:

"The prohibition against the issuing of stock or bonds, except for money or property actually received or labor done, and against the fictitious increase

of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value."

In Kemmerer et al. v. St. Louis Blast Furnace et al., 212 Fed. 63, 128 C. C. A. 519, the Circuit Court of Appeals, Eighth Circuit, had under consideration the constitutional provision of the state of Missouri on this subject, section 8 of article 12, and section 2981 of the Revised Statutes of 1909 of that state, and which provide that:

"Bonds of a corporation shall be issued only for money paid, labor done, or property actually received, and all fictitious increase of indebtedness shall be void."

The court held that bonds of a corporation issued and pledged to secure a pre-existing debt due from it "are invalid where no consideration passed to it from the creditor."

I do not see how this case of 'Kemmerer et al. v. St. Louis Blast Furnace Co. et al., supra, decided by the Circuit Court of Appeals of the Eighth Circuit, can be reconciled with the decision of the Circuit Court of Appeals, Seventh Circuit, in First Savings & Trust Co. et al. v. Waukesha Canning Co. et al., supra. They seem to be decidedly in conflict. The case in the Seventh circuit was decided January 14, 1914, and the case in the Eighth circuit was decided February 24, 1914. In the case of Kemmerer v. St. Louis Blast Furnace Co. et al., Judge Carland cited and quoted from Nichols v. Waukesha Canning Co. (D. C.) 195 Fed. 807, reversed in Waukesha Canning Co. v. First Savings & Trust Co., 211 Fed. 927, 128 C. C. A. 305, by the Circuit Court of Appeals, Seventh Circuit, as stated, and evidently was unaware of the fact that the case had been reversed by the Circuit Court of Appeals. However, the court in the Kemmerer Case cited (212 Fed. 63, 128 C. C. A. 519) expressly states that bonds issued by a corporation to secure a pre-existing debt of such corporation "are invalid where no consideration passed to it from the creditor." In other words, it would seem that, where a corporation makes its bonds secured by mortgage on its property and issues them as security merely for a pre-existing debt, such bonds are invalid in the hands of the pledgee unless there is some new consideration, and we would infer that that court would have held such bonds valid in case there had been some new or additional consideration for the pledge of the bonds. In the case now before this court I think there was a new and an independent consideration for the issue and delivery of the bonds in question to the bank. The corporation was unable to secure or furnish to the bank the indorsement of Wing. The bank required security in place of his name, and it is fair to assume that it would not have continued the loan but for the substitution of the additional security to it, the pledge of these bonds. A new note was given, time of payment was extended, and the bank lost the benefit of the indorsement of Wing and surrendered the old note indorsed by Wing. The old note was for $7,000, as was the new note, and the bank has agreed with the indorsers at least that it will not sell such bonds so pledged for less than their par value, to

wit, $7,000. If the bank adheres to this agreement, as it must, the bonds of the corporation will have been disposed of in satisfaction of the pre-existing debt, time of payment extended by the acceptance of the new note, at their full par value. The corporation will lose nothing. Its creditors will have suffered no loss. In effect, it will be the same as though the corporation had given to the bank a mortgage on its real property to secure this pre-existing debt of $7,000.

Nearly all the cases recognize the right and power of a corporation in the face of the limitation on the power of a corporation to pledge its bonds or obligations secured by mortgage on its property as security for a debt presently contracted for money borrowed, work done, or property purchased. Memphis, etc., Railroad v. Dow, 120 U. S. 287, 298, 7 Sup. Ct. 482, 30 L. Ed. 595; Illinois Trust & Savings Bank v. Pacific Railway Co., 117 Cal. 332–344, 49 Pac. 197. In California, as stated, there is a constitutional provision that no railroad corporation shall issue stock or bonds except for money, labor, or other property actually received by the corporation. In the case last cited it was held that the right of a corporation to pledge its bonds as collateral security is included in the right to sell them; and a constitutional provision that no railroad corporation shall issue stock or bonds except for money, labor, or other property actually received by the corporation does not prevent such pledge, where money or other property is actually received by the corporation in consequence of such use of them. In its opinion at page 344 of 117 Cal., at page 201 of 49 Pac., the court said:

"By the Constitution of Illinois it is provided that no railroad corporation shall issue stock or bonds except for money, labor, or property actually received and applied to the purposes for which such corporation was created; the Constitution of this state (article 12, § 11) contains a similar provision—omitting the clause as to application of the money, labor, or property. Upon these provisions appellant contends that it had no power to pledge its own bonds as collateral security. When the bonds were so pledged, and money or other property was actually received in consequence of such use of them, it seems to us that in a just and natural sense the bonds were issued 'for' such money or property; they served the purpose designed by the company—procured value for it. The cases upon the subject uphold the right to pledge as included in the right to sell. Farmers' Loan, etc., Co. v. Toledo, etc., R. R. Co., 54 Fed. 759 [4 C. C. A. 561]; Leo v. Union Pac. Ry. Co. (C. C.) 17 Fed. 273; Nelson v. Hubbard, 96 Ala. 238 [11 South. 428, 17 L. R. A. 375], decided in view of a constitutional provision substantially the same as that of California in this particular; Duncomb v. New York, etc., R. R. Co., 84 N. Y. 190. Some of these cases recognize the right of the corporation to pledge its bonds to secure a precedent debt. Appellant relies somewhat on Brewster v. Hartley, 37 Cal. 15, 99 Am. Dec. 237, where it was held that certificates of stock issued by a corporation in pledge to secure its debt are illegally issued; an examination of the grounds upon which the decision went in that case shows, we think, that the question here presented is widely different; it seems unnecessary to enlarge upon the points of diversity. See, besides the cases cited above, 1 Morawetz on Corporations, §§ 349, 350; Pfister v. Milwaukee, etc., Ry. Co., 83 Wis. 86 [53 N. W. 27]."

In Peoria, etc., R. Co. v. Thompson, 103 Ill. 187, it was held that a constitutional or statutory provision which prohibits railroad companies from issuing stock or bonds except for money, labor, or property actually received and applied to the purposes for which the company was

created does not interfere with the usual methods of raising money by issuing stock and bonds for legitimate corporate purposes, as for the purpose of raising money to pay debts incurred in constructing and equipping its road; nor does it prohibit the company from delivering bonds as advanced payment on a contract obligation of as great value as the bonds. Commonwealth v. Lehigh Ave. R. Co., 129 Pa. 405, 18 Atl. 414, 498, 5 L. R. A. 367; Hudson River, etc., R. Co. v. Hanfield, 36 App. Div. 605, 55 N. Y. Supp. 877.

In Memphis, etc., Railroad v. Dow, supra, the court held:

"The provision in the Constitution of Arkansas of 1874 that 'no private corporation shall issue stock or bonds except for money or property actually received, or labor done, and all fictitious increase of stock or indebtedness shall be void,' does not prevent the carrying out of an agreement between mortgage bondholders of an embarrassed railroad company in that state by which it was agreed that trustees should buy in the mortgaged property on foreclosure, and convey it to a new company to be organized by the bondholders, which should issue new mortgage bonds to pay the expenses of the sale, and other new mortgage bonds to be taken by the bondholders in lieu of their old bonds, and full paid up stock subject to the mortgage debt, to be delivered to and held by the bondholders without any payment of money; and the bonds issued under such an agreement are not subject to the provisions of section 5488, Rev. Stat. Ark. (Mansfield's Digest, p. 1057), respecting the legal rate of interest for certain classes of railroad securities."

I have not called attention to all of the cases bearing on the real question involved here. In view of the authorities to which attention has been called, and of the provisions of the New York statute and the statutory and constitutional provisions very similar thereto of other states and the decisions thereunder, this court cannot give a construction to the New York statute which will prohibit a corporation owing debts outstanding and pressing for payment, and represented by its notes past due and indorsed by third persons, but whose indorsements the corporation is no longer able to obtain, to renew such notes, secure an extension of time, and secure the payment of such renewal notes at maturity by a pledge of its bonds secured by a mortgage on its real estate, provided the transaction is just and fair, and the obligations of the corporation so pledged are of no greater par value than the debt thus secured, and the corporation is solvent at the time, and the old obligations of the debtor are surrendered and the indorsers thereby released. It cannot be doubted that if the Progressive Wall Paper Corporation, finding itself unable to longer secure the indorsement of Wing and through it a renewal of its note at the bank, had executed a new note indorsed by Cunningham, Derby, and Ingalsbee for the same amount and due three or six months later, and had presented same at the bank for discount to obtain money to take up the old note, and had been refused on account of the insufficiency of the security of the indorsers, and the corporation had thereupon pledged $7,000 of its mortgage bonds as additional security for the payment of such note, and had thereupon secured the discount of such note at the bank, and had the proceeds of such note passed to its credit, and thereupon had given its check to the bank in payment of the old note, and had thus secured a surrender of the old note, that the transaction would have been legal and binding, and that the issue of such bonds by so pledging

them to the bank would have been legal, proper, and binding under the statute.

Can it make any difference that this formality was not gone through with, to the end that the old note might be taken up and a further credit for the same amount obtained at the same bank? The result, so far as the corporation and its creditors are concerned, is precisely the same. Through the transaction as it actually occurred there was no violation of the true spirit and intent of the statute as declared by the Supreme Court of the United States in the Dow Case. Is it the true interpretation of this provision of the statute that for every bond of a corporation issued there must be a new acquisition by the corporation of money or labor performed or property purchased of substantially equal value? Is it true that a corporation doing business is prohibited to take up its notes, given for full value received either in money, labor, or property, and retire same by an issue of its bonds duly and formally authorized? Is it true that under this provision of the statute a solvent corporation doing business is forbidden to make temporary loans of money which are used in its legitimate corporate business, or incur debts for labor performed for the corporation in the due course of its business, or purchase property for the legitimate uses of the corporation, obtaining temporary credit for such loan, labor, or property as the case may be, and then, finding itself unable to pay at maturity, secure such debts by a pledge of its bonds secured by a mortgage on its property, including that into which the money, labor, or property went, and for which such debts were incurred? Can it be doubted that if the corporation, under such circumstances, instead of pledging its bonds, should sell such bonds for par, and receive the money therefor, and apply same in payment of such debts, such bonds would be valid, even if the purchaser thereof knew the purpose of the issue and the disposition to be made of the money at and before the purchase of such bonds. It would be a mere disposition of the bonds and obligations of the corporation for the purpose of raising money with which to pay and retire its outstanding promissory notes; that is, to pay pre-existing indebtedness. If, then, it be held that a corporation may issue and deliver its bonds to its creditor under the circumstances here disclosed as security for the pre-existing debt incurred for the benefit of the corporation in the legitimate conduct of its business and that such issue is valid, but is subject to the limitation that the pledgee may not sell or dispose of such bonds for less than their par value or value as determined in cases of insolvency, for instance, by a sale or disposition of the property of the corporation pledged for their payment, the purpose and intent of the statute is fully met and complied with.

The character and terms of the contract of pledge of the bonds to secure the payment of the pre-existing indebtedness is not unlimited. The issue may be valid, and the contract of pledge too broad, and not enforceable under the statute. The note of the Progressive Wall Paper Corporation of October 17, 1914, renewal of the prior notes of like tenor, promises to pay $7,000 three months after date and recites:

"Having deposited with said bank as collateral security seven bonds [description thereof] with full power to sell same at public or private sale at

the option of said bank after ten days' notice in writing, by mail, directed to us at Plattsburg, N. Y., to apply the proceeds thereof towards the payment of this note and of any other note or notes held by the said bank of which we are either the maker or indorser, accounting to us for the surplus of said sale, if any, with interest."

This is the contract of pledge. In no way does it expressly limit the amount for which the bonds may be sold. Literally and according to the terms broadly construed the bonds may be sold and put upon the market at ten cents on the dollar of their par value. In such case the holder of the note would credit the $700 received on the sale of the bonds, and prove up its claims against the Progressive Wall Paper Corporation, now insolvent, for the balance, or $6,300. The holder of the bonds could receive its share under the mortgage given to secure the bonds and prove up for the deficiency, if any. The purchaser of the bonds would be a large gainer, maybe, and the corporation and its creditors large losers. The statute referred to prohibits such a transaction as this. The Circuit Court of Appeals in this (the Second) circuit, in In re Waterloo Organ Co., 134 Fed. 345, 67 C. C. A. 327, held:

"That where a corporation, being in need of money, pledged certain of its bonds to a bank as security for further credit, under an agreement that the corporation might sell any of the bonds *at par*, and, on delivery of the proceeds thereof to the bank, it would release and redeliver such bonds to the corporation, and the bank immediately thereafter extended its line of credit to the corporation, such bonds were properly issued, and constituted valid claims against the corporation's estate in bankruptcy."

The court in its opinion said:

"The record fails to show any written agreement fixing the value at which the bonds were issued. It is agreed that their par value was their fair market value. In case of doubt as to the character of a transaction, or as to the proper construction and interpretation of a contract, and the determination of the respective rights and obligations of the parties thereto, such doubts may be resolved, and the intention or understanding of the parties thereto may be determined, by a consideration of their relations, the objects they respectively had in view, their declarations at the time of the transaction, and their acts then and *thereafter done.*"

The court therefore held that in view of all the facts and circumstances it should be held that the agreement and intent of the parties was that the bonds should not be sold by the bank at less than par.

In First Savings & Trust Co. v. Waukesha Canning Co. et al., 211 Fed. 927, 128 C. C. A. 305, there was no express contract or agreement by the pledgees that they would accept the bonds as collateral and account therefor at 75 per cent. of their par value, or not dispose of same at a less sum. But the court held that such an agreement was implied from the fact that the pledgees knew that to validate the issue they must be taken, if at all, at not less than 75 per cent. of their par value. The court therefore held that this was the understanding of the parties, and that the issue of the bonds as collateral was legal and valid.

In the case at bar it is presumed that the bank knew the law, and that there was no intent or purpose to violate it. It appears in the evidence, and is found by the referee as a fact, although not incorporated in the order:

"(11) That the First National Bank of Ballston Spa and said indorsers have consented and agreed that said bonds, if sold or disposed of, shall not be sold or disposed of at less than par."

This evidences the purpose and intent of the parties and of the bank. The finding quoted as filed reads, "First National Bank of Hudson Falls, N. Y.;" but there is no First National Bank of Hudson Falls involved in the proceedings, although there is a similar proceeding wherein the "People's National Bank of Hudson Falls, N. Y.," is claimant. I am assured by letter that the words "Hudson Falls," in the eleventh finding quoted, should be "Ballston Spa," and that this clerical error will be corrected.

It is true that the statute of the state of New York referred to contains no express provision that the bonds of a corporation secured by mortgage on its property shall not be sold for less than their par value, or given in payment for labor at less than their par value, or given in payment for property purchased for corporate purposes at less than their par value; but who can doubt that it would be unlawful, and that the issue of bonds would be void, should the corporation issue its bonds for money borrowed at 50 per cent. of their par value, or exchange same for labor at 50 per cent. of their par value, or use them to pay for property purchased at 50 per cent. of their par value, thereby loading the corporation with an obligation to pay double that of the value received? Such bonds so issued, unless on the market and in circulation and in the hands of a bona fide holder for value, might be held and probably would be held void. In the hands of a bona fide holder for value when purchased on the market such bonds would be held valid; but in the hands of the pledgee of the corporation clearly such issue would be invalid. Such pledgee, while a holder for some value, would not be a holder for full value, and would not be a holder in good faith.

I think the provision of the New York statute quoted, fairly construed, means that the bonds may be issued for money borrowed at substantially their par value, or given in exchange for labor substantially equal in value to the par value of the bonds, or given in exchange for property to be used for the corporate purposes of the corporation of substantially equal value to the par value of the bonds. The right to sell and dispose of the bonds includes the right to pledge them, as we have seen; but when pledged by the corporation issuing them, with power in the pledgee to sell, the obligation must be imposed on the pledgee to dispose of them at substantially their par value. The policy of the law is that a corporation shall not be loaded with obligations to pay issued for inadequate considerations. In Duncomb et al. v. N. Y., H. & N. R. R. Co. et al., 84 N. Y. 190, it was held in 1881 that:

"The director of a railroad corporation cannot purchase its bonds below par except on peril of avoidance by the courts upon application of the corporation."

[3] In the case at bar officers of the corporation were indorsers upon the note, and were seeking a renewal of the loan and pledging bonds, not only for the benefit of the corporation, but for their own benefit and protection, and the bank was fully informed as to the situa-

tion. The corporation has agreed, as stated, that it will not sell the bonds at less than par, and this must be taken as an indication, of its understanding of the obligations of the contract of pledge—a practical construction thereof. If on foreclosure of the mortgage given to secure the payment of these bonds, or on a sale of the mortgaged property by the trustee in bankruptcy, the bank fails to realize a sufficient sum to pay such bonds in full, and consequently the note in full, it may prove up for the balance, and neither the bank, nor the corporation, nor its creditors will suffer. [1] The bankruptcy court is a court in equity, and may do equity, guided by the well-established principles of equity jurisprudence. The trustee in bankruptcy has taken the property of the bankrupt corporation subject to the same rights and equities that existed in favor of the bank and other creditors prior to such bankruptcy. The bank had carried this loan for about two years when bankruptcy intervened, holding the bonds of the corporation as collateral security, and the validity of such pledge of the bonds had not been questioned by the corporation. As stated, it is not questioned that the original loan of money represented by the note in question was received from the bank for proper corporate uses and purposes. When it took these bonds the bank lost its right of action against Wing, as well as a present right of action against the corporation itself. It received in exchange these bonds in pledge, and I think that with its agreement that they shall not be sold or disposed of for less than their par value the statute is satisfied, and that the issue thereof should be held valid.

It follows that the order of the referee holding the bonds invalid, and void in the hands of the bank should be reversed, and that the injunction against a sale or disposition thereof should be modified, so as to provide that the bank is enjoined and restrained from disposing of same at less than their par value. The notice that the bonds will be sold by the bank contains no such limitation or qualification. If the bank will file a stipulation that it will not sell or undertake to sell or dispose of these bonds for less than their par value, and stating that such agreement was a part of the contract of pledge, there may be an order reversing the order of the referee now under review. This will clear the situation and leave the bank free to act in the premises. Should the bank then violate the agreement or contract of pledge as thus made definite and certain, it would be answerable to the referee in bankruptcy for any loss the estate represented by him might sustain.

There will be an order accordingly.

[1] See, however, MacQuoid v. Queens Estates, 143 App. Div. 134, 136, 137, 127 N. Y. Supp. 867, and Gamble v. Q. C. W. & Co. et al., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527.